## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **VIVIAN CLAYBORNE,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Civil Action No. 05-915 (RMC)** |
| ) | |
| **JOHN E. POTTER, Postmaster General,** ) | |
| **United States Postal Service,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

## MEMORANDUM OPINION

Plaintiff Vivian Clayborne suffers from retinitis pigmentosa, an eye condition which has progressed over the years so that she is now almost completely blind without assistive devices. This condition made it increasingly difficult for her to fulfill the functions of her job as a mail processing clerk with the United States Postal Service ("USPS"). As a result, USPS relieved Ms. Clayborne of many of her duties and assigned her solely to stack and clear empty bins. Nonetheless, Ms. Clayborne began to have accidents at work that led to injuries to herself and that were attributed by her supervisor to her sight problems. Ultimately, USPS decided that Ms. Clayborne was a danger to herself because of her near-blindness and placed her on sick leave. USPS also referred her to the USPS District Reasonable Accommodation Committee ("DRAC"). With input and assistance from the Columbia Lighthouse for the Blind, USPS returned Ms. Clayborne to work a year later with a special assistive device (essentially a powerful light and super magnifying glass), to work in a different position in the Registered Mail operations manually sorting mail.

Ms. Clayborne brought this suit against John E. Potter, Postmaster General, in his

capacity as representative of USPS, alleging disability discrimination and a failure to accommodate her physical disability in violation of the Rehabilitation Act of 1973 ("Rehab Act"), 29 U.S.C. §§ 791 *et seq.*  USPS moves to dismiss or for summary judgment.  Because USPS did not discriminate against Ms. Clayborne, and in fact it accommodated her disability, the Court will grant its motion for summary judgment.

## I.  FACTUAL BACKGROUND

The facts are presented in USPS's Statement of Material Facts For Which There Is Not [sic] Genuine Dispute ("Def.'s Facts") and the attached Exhibits ("Def.'s Ex. " ").  Because Ms. Clayborne does not dispute any of these facts, they are taken as conceded.[1]  In any event, the facts set forth by USPS are supported and corroborated by contemporary documentation.

Ms. Clayborne was employed as a mail processing clerk with USPS starting in 1986. Def.'s Ex. 1.  Her duties as a mail processing clerk included: 1) setting up and preparing the work area and equipment; 2) loading mail onto automated equipment and culling out non-processable items; 3) sweeping mail from bins and stackers; 4) stopping the equipment when the operation is complete; 5) clearing jams in the equipment; and 6) removing sorted mail from the bins and placing it into the appropriate trays.  Def.'s Ex. 2.

Ms. Clayborne was diagnosed with retinitis pigmentosa in 1987 and still has that condition today.  Def's Facts ¶ 2; Def.'s Ex. 3.  Over the years, this condition caused continuing deterioration in her eyesight, making it increasingly difficult for her to fulfill the functions of her job.

---

[1] *See* LCvR 7(h) (facts set forth in motion for summary judgment are admitted if not controverted in response to summary judgment); *see also Jackson v. Finnegan, Henderson, Farabow, Garrett & Dunner*, 101 F.3d 145, 151 (D.C. Cir. 1996); *Twist v. Meese*, 854 F.2d 1421, 1423-25 (D.C. Cir. 1988); *Heasley v. D.C. Gen. Hosp.*, 180 F. Supp. 2d 158, 163 (D.D.C. 2002).

*Id*. ¶ 2 n.1; Def.'s Ex. 3.  As a result, starting in the fall of 2001, USPS assigned Ms. Clayborne fewer of the tasks that comprised the full range of duties of her position, until the only task assigned to Ms. Clayborne was the task of stacking and clearing empty bins.  Def.'s Ex. 4.  Eventually, Ms. Clayborne could no longer read the mail or distinguish red emergency lights on the equipment because of color-blindness.  Def.'s Ex. 8.

Between January and July 2003, Ms. Clayborne had three accidents at work that led to injuries to herself and that were attributed by her supervisor to her sight problems.  Def.'s Ex. 8.  Ms. Clayborne had an accident while entering the building for work on January 10, 2003 — her left foot hit the flower bed in front of the building and she suffered a bruised right leg, a scarred and swollen left knee, and a scarred left hand.  Def.'s Ex. 5.  On June 19, 2003, Ms. Clayborne twisted and injured her left ankle when she was walking to the time clock to begin work.  Def.'s Ex. 6.  These accidents caused Ms. Clayborne's supervisor, Michael Fair, to refer her for a fitness-for-duty exam.  Def.'s Ex. 8.  He completed a request for a fitness-for-duty exam, reporting that he believed she "might have visual, equilibrium, and or [sic] physical coordination problems.  She had two similar accidents that resulted in injury.  I want to prevent a reoccurrence that might result in another injury that may prove serious or even fatal."  *Id*.  After completing the request for an exam, Mr. Fair notified the Human Resources ("HR") Manager that Ms. Clayborne "had another accident that I [attribute] to deteriorating vision.  She stated that on 7/16/03, while she was loading an All-purpose Container, she hit her head with a plastic tray."  Def.'s Ex. 9; *see also* Def.'s Ex. 7.

In response to Mr. Fair's referral, on July 30, 2003, the Contract Medical Officer working for the USPS recommended that Ms. Clayborne receive an "escort into building [and] on[to] floor," as well as "continued accommodation at the worksite if possible, while awaiting completion

of disability retirement process." Def.'s Ex. 10.  Ultimately, USPS decided that Ms. Clayborne was

a danger to herself because of her near-blindness.  On September 17, 2003, USPS  referred her to

the DRAC, the reasonable accommodation committee.  Def.'s Ex. 11.  The DRAC is a multi-

disciplinary task force that determines whether an employee qualifies for accommodation under the

Rehab Act and determines what accommodation is required, including transfer or reassignment.  *Id.*

On September 23, 2003, USPS placed Ms. Clayborne on sick leave.  Def.'s Ex. 4.

Ms. Clayborne alleges that "management forced her to complete a leave slip and told her not to

return to work until further notice."  Am. Compl. ¶ 4.  Initially, Ms. Clayborne considered pursuing

disability retirement.  When she decided not to pursue retirement, the DRAC met with her to discuss

her medical condition on February 13, 2004.  Def.'s Ex. 11, Decl. of Toni Grier ("Grier Decl.") ¶

3.  The DRAC asked for updated medical information.  *Id.*  Receiving no answer, the DRAC sent

a second request for information to Ms. Clayborne on February 25, 2004.  *Id.*  Thereafter,  on March

24, 2004, the DRAC met with Ms. Clayborne and a vocational representative from the Columbia

Lighthouse for the Blind.  *Id.* ¶ 4.

The DRAC met again on April 7, 2004, to consider alternative jobs that Ms.

Clayborne could perform.  *Id.*  On June 21, 2004, representatives from the Lighthouse for the Blind

conducted an on-site visit at USPS and reviewed the operation to determine what, if any,

technological enhancements could be provided to assist Ms. Clayborne.  *Id.* ¶ 5.  On July 5, 2004,

the Lighthouse for the Blind recommended that Ms. Clayborne could manually sort mail with the

assistance of a device called an Olympia CCTV, essentially a strong light and super magnifying

glass.  *Id.* ¶ 6.  Lighthouse for the Blind provided this equipment to the USPS in September 2004

and it was installed in the Registered Mail operations, where Ms. Clayborne was reassigned and

returned to work on September 29, 2004.  *Id.* ¶ 7.

## II. STANDARD OF REVIEW

Where matters outside the pleadings are presented in a motion to dismiss, a court must treat the motion as one for summary judgment under Rule 56.  Fed. R. Civ. P. 12(b)(6).  Here, matters outside the pleadings have been presented, and thus the Court treats USPS's motion as one for summary judgment.

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment must be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *see also Diamond v. Atwood*, 43 F.3d 1538, 1540 (D.C. Cir. 1995).  Moreover, summary judgment is properly granted against a party who "after adequate time for discovery and upon motion . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

In ruling on a motion for summary judgment, the court must draw all justifiable inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true.  *Anderson*, 477 U.S. at 255.  A nonmoving party, however, must establish more than "the mere existence of a scintilla of evidence" in support of its position.  *Id.* at 252.  In addition, the nonmoving party may not rely solely on allegations or conclusory statements.  *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).  Rather, the nonmoving party must present specific facts that would enable a reasonable jury to find in its favor.  *Id.*, 164 F.3d at 675.  If the evidence "is merely colorable, or is

not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).[2]

## III. ANALYSIS

"The Rehabilitation Act of 1973 governs employee claims of handicap discrimination against the Federal Government. Its basic tenet is that the Government must take reasonable affirmative steps to accommodate the handicapped, except where undue hardship would result." *Barth v. Gelb*, 2 F.3d 1180, 1183 (D.C. Cir. 1993). The Act provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of his or her disability . . . be subjected to discrimination under any program or activity . . . conducted by any Executive Agency . . . ." 29 U.S.C. § 794(a).[3] The statute does not protect all disabled individuals from all types of adverse employment actions; it protects a defined class of persons from particular types of discrimination. *Flemmings v. Howard Univ.*, 198 F.3d 857, 860 (D.C. Cir. 1999). To establish a prima facie case of discrimination under the Rehab Act, a plaintiff must demonstrate that she is a qualified person with a disability; that she can perform the essential functions of her job with or without reasonable accommodation; and that her employer failed to reasonably accommodate her disability or that she was terminated due to her disability. *Barth*, 2 F.3d at 1186; *Carr v. Reno*, 23 F.3d 525, 529 (D.C. Cir. 1994).

---

[2] Ms. Clayborne argues that summary judgment in this case is premature because she has not yet conducted discovery. This argument lacks merit, as Ms. Clayborne has completely failed to controvert USPS's facts.

[3] For purposes of employment discrimination cases, the standards for liability under the Rehab Act and the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 *et seq.*, are the same. *See* 29 U.S.C. § 794(d); *Carroll v. England*, 321 F. Supp. 2d 58, 69 n.7 (D.D.C. 2004). Thus, cases interpreting either are applicable in determining liability. *Bell v. Gonzales*, 398 F. Supp. 2d 78, 86 n.9 (D.D.C. 2005).

USPS contends that Ms. Clayborne is not a "qualified individual" with a disability with regard to her position as a mail processing clerk and further that it accommodated her first by modifying her mail processing clerk duties and then by assigning her to work in Registered Mail operations with the assistance of the Olympia CCTV device.[4]

## A.  "Qualified Individual"

A "qualified individual" is one "with a disability who, with or without reasonable accommodation, can perform the essential functions[5] of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8).  An individual who cannot perform the essential duties of her job, even with an accommodation, is not "qualified" under the statute.  *Chinchillo v. Powell*, 236 F. Supp. 2d 18, 24 (D.D.C. 2003).  Further, an individual who presents a "direct threat" to her own safety or that of others is not "qualified."  *Darnell v. Thermafiber, Inc.*, 417 F.3d 657, 660 (7th Cir. 2005); 29 C.F.R. § 1630.15; *see also Taylor v. Rice*, No. 03-1832, 2005 WL 913221, *11 (D.D.C. April 20, 2005)  ("An employer may escape liability under the Rehabilitation Act if it can establish that the employee poses a direct threat to himself or others in the workplace"), *rev'd on other grounds*, 451 F.3d 898 (D.C. Cir. 2006).  A "direct threat" is defined as follows:

---

[4] In its motion to dismiss or for summary judgment, USPS also argued that Ms. Clayborne failed to show that she is "disabled" as defined by the Rehab Act.  However, during oral argument on its motion on June 23, 2006, USPS conceded that Ms. Clayborne is "disabled" under the Act.

[5] "Essential functions" are the fundamental duties of a position. 29 C.F.R. § 1630.2(n)(1). Courts frequently defer to the employer's judgment as to what functions of a job are essential. *Kalekiristos v. CTF Hotel Mgmt. Corp.*, 958 F. Supp. 641, 660 (D.D.C. 1997), *aff'd*, 132 F.3d 1481 (1997) (Table).  Some of the factors that courts evaluate in determining whether a job function is "essential" include the amount of time that is required to perform the function; the consequences of not requiring that such function be performed; and whether current and former employees holding the same position performed the function.  *See Baker v. Potter*, 294 F. Supp. 2d 33, 43 (D.D.C. 2003); 29 C.F.R. § 1630.2(n)(3).

Direct Threat means a significant risk of substantial harm to the health and safety of the individual or others that cannot be eliminated or reduced by reasonable accommodation. The determination that an individual poses a "direct threat" shall be based on an individualized assessment of the individual's present ability to safely perform the essential functions of the job. This assessment shall be based on a reasonable medical judgment that relies on the most current medical knowledge and/or on the best available objective evidence. In determining whether an individual would pose a direct threat, the factors to be considered include:

(1) The duration of the risk;

(2) The nature and severity of the potential harm;

(3) The likelihood that the potential harm will occur; and

(4) The imminence of the potential harm.

29 C.F.R. § 1630.2.

The Supreme Court has recognized the threat-to-self defense in the context of agency rulemaking. In *Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. 73 (2002), the plaintiff sued Chevron for disability discrimination because Chevron asked a contractor to reassign plaintiff due to the plaintiff's liver condition. The liver condition would have been exacerbated by exposure to toxins if the employee had remained in his current position. In defense, Chevron argued that the plaintiff's disability posed a direct threat to his safety and thus he was not "qualified" for the job. The district court granted summary judgment in favor of Chevron. *Id*. at 77. On appeal, the Ninth Circuit found that the Equal Employment Opportunity Commission regulation which recognized the threat-to-self defense exceeded the scope of permissible rulemaking; the court reversed the summary judgment. *Id.* Subsequently, the Supreme Court reversed and remanded. The Supreme Court held that the regulation which permitted employment qualification standards to include a requirement that individuals shall not pose a direct threat to health and safety in the workplace was not outside the

scope of permissible rulemaking.  *Id*. at 86 (construing 29 C.F.R. § 1630.15).

The "threat-to-self" defense was also recognized by the Seventh Circuit in *Darnell*, 417 F.3d 657.  There, plaintiff brought suit under the ADA against a manufacturer who had rescinded an employment offer because the plaintiff had unregulated diabetes.  The court held that the employer was not liable because the plaintiff posed a direct threat to workplace safety.  The court explained that an individual with unregulated diabetes could suffer from unconsciousness, confusion, and impaired judgment, and this would pose a substantial danger to plaintiff because employees at the manufacturing plant were required to climb tall ladders and operate dangerous machinery.  *Id*. at 661; *accord McGeshick v. Principi*, 357 F.3d 1146, 1148 (10th Cir. 2004) (employer did not violate Rehab Act when it denied plaintiff a position as a housekeeping aid due to plaintiff's Meniere's disease; the disease caused hearing loss and vertigo and employing plaintiff would have posed a direct threat to his own safety because the job entailed climbing stairs and ladders and cleaning upper floor exterior windows); *see Amariglio v. Nat'l R.R. Passenger Corp.*, 941 F. Supp. 173, 178-79 (D.D.C. 1996) (person with uncontrolled diabetes is not qualified to perform the essential functions of a train attendant without creating a substantial risk of harm to the passengers; train attendants are responsible for opening car doors, loading and unloading passengers, and securing car doors after passengers have loaded).

As her eyesight deteriorated, Ms. Clayborne became unqualified for her job as a mail processing clerk.  USPS modified her duties over time, eventually reducing them to only one task, that of stacking and clearing empty bins.  Def.'s Ex. 4.  Because she could not perform the essential functions of her job as a mail processing clerk, she was unqualified for the position.  *See Chinchillo*, 236 F. Supp. 2d at 24.

Further, Ms. Clayborne was unqualified because her near-blindness posed a direct threat to her own safety.  She had three workplace accidents between January and July of 2003, and her supervisor requested that she have a fitness-for-duty exam in order to prevent another accident, which he feared could be serious or even fatal.  Def.'s Exs. 5-9.  On July 30, 2003, the Contract Medical Officer recommended that Ms. Clayborne receive an escort into the building and to her worksite.  Def.'s Ex. 10.  By the end of September 2003, USPS placed Ms. Clayborne on sick leave and referred her to DRAC, the accommodation committee.  Because Ms. Clayborne could not perform the essential functions of her job as a mail processing clerk, even with accommodations, and because she was a direct and substantial threat to her own safety as demonstrated by her repeated workplace accidents, she was not a "qualified individual" under the Rehab Act.  Accordingly, USPS did not discriminate against Ms. Clayborne when it placed her on sick leave.

### B.  Reasonable Accommodation

While Ms. Clayborne was not a "qualified individual" with regard to her position as a mail processing clerk, this does not end the inquiry.  A federal agency must reasonably accommodate the known limitations of an employee who is a qualified individual with a disability, unless the agency can demonstrate that the accommodation would impose an undue hardship on its operations.  *Carr*, 23 F.3d at 528-29.  In other words, accommodations are reasonable if they allow the employee to perform the essential functions of the job, without imposing undue hardship on the employer.  *Chinchillo*, 236 F. Supp. 2d at 23.  It is the employee's burden to identify reasonable accommodations, which would allow her to perform the essential functions of the job, and the agency has the burden of showing undue hardship.  *Id.* at 23-24.

The duty to accommodate is a continuing duty that is not exhausted by one effort.

*Humphrey v. Mem'l Hosps. Ass'n*, 239 F.3d 1128, 1138 (9th Cir. 2001).  Reasonable accommodation may include job restructuring, part-time or modified work schedules, acquisition or modification of equipment or devices, and reassignment to another position.  42 U.S.C. § 12111(9)(B); 29 C.F.R. § 1630.2(*o*); *Carr*, 23 F.3d at 529.  The duty to accommodate does not require an employer to relieve the employee of any essential functions of the job or modify the actual duties.  *Robertson v. Neuromedical Ctr.*, 161 F.3d 292, 295 (5th Cir. 1998); *Chinchillo,* 236 F. Supp. 2d at 24.

If accommodation cannot be made in the employee's current position, the federal employer must consider the feasibility of reassigning the disabled employee to a vacant position. *Carr*, 23 F.3d at 530; *Aka v. Washington Hosp. Ctr.*, 156 F.3d 1284, 1301 (D.C. Cir. 1998); *see* 42 U.S.C. § 12111(8) (defining a qualified individual with a disability as one who, with or without reasonable accommodation, "can perform the essential functions of the employment position that such individual *holds or desires*.") (emphasis added).  The parties have a duty to proceed in a "reasonably interactive manner" to determine whether the employee would be qualified, with or without reasonable accommodations, for another job assignment, and, if so, to identify an appropriate reassignment opportunity.  *Smith v. Midland Brake, Inc.*, 180 F.3d 1154, 1173 (10th Cir. 1999); *see also Aka*, 156 F.3d at 1304 n.27 (employee had an obligation to demonstrate that there was a vacant position to which he could have been assigned and employer had a corresponding duty to help identify appropriate job vacancies).[6]

Here, Ms. Clayborne contends that the 12-month delay from the time she went on sick

---

[6] The employer is not require to turn away a superior applicant for the vacant position, *EEOC v. Humiston-Keeling, Inc.*, 227 F.3d 1024, 1027-28 (7th Cir. 2000), to "bump" another employee to create a vacancy, or to create a new position.  *Aka*, 156 F.3d 1284, 1305; *Gile v. United Airlines, Inc.*, 95 F.3d 492, 499 (7th Cir. 1996).

leave to the time she returned to work in her new position in Registered Mail operations was unreasonable and thus USPS discriminated against her by failing to provide a reasonable accommodation. In *Jay v. Intermet Wagner Inc.*, 233 F.3d 1014 (7th Cir. 2000), the plaintiff made a similar claim, alleging that a 20-month delay before reassignment was unreasonable. In *Jay*, the plaintiff was a millwright who went on medical leave when he tore his Achilles tendon. Thereafter, he was precluded from performing any job that involved climbing. When he requested to be reinstated as a millwright, his employer refused because climbing was an integral part of the millwright's job. The employer instead placed Mr. Jay on an extended medical leave and considered him weekly for reinstatement to a position that did not require climbing. Twenty months later, the employer assigned Mr. Jay to a new position. The court found that the employer acted reasonably and in good faith. "It simply took a long time for a position to become available which met Jay's work restrictions and for which Jay's seniority qualified him." *Id*. at 1017.

Although USPS was not required to modify Ms. Clayborne's essential duties as a mail processing clerk, *Robertson*, 161 F.3d at 295; *Chinchillo,* 236 F. Supp. 2d at 24, USPS did so. Later, in September of 2003, when Ms. Clayborne could no longer function as a mail processing clerk because her disability threatened her own safety, USPS put her on sick leave and referred her to the accommodation committee, DRAC. In February 2004, the DRAC requested medical information from Ms. Clayborne, and in March 2004 the DRAC met with her and with a representative from the Lighthouse for the Blind. Def.'s Ex. 11, Grier Decl. In April 2004, the DRAC met again to consider alternative jobs that Ms. Clayborne could perform. On June 21, 2004, representatives from the Lighthouse for the Blind conducted an on-site visit, and on July 5, 2004, the Lighthouse for the Blind recommended that Ms. Clayborne could manually sort mail with the assistance of the Olympia

CCTV.  Lighthouse for the Blind provided this equipment to the USPS in September 2004.  *Id*.  The equipment was installed in the Registered Mail operations, where Ms. Clayborne was reassigned and returned to work on September 29, 2004.   This course of events demonstrates that USPS acted reasonably and in good faith in accommodating Ms. Clayborne's disability.   This process simply took a year.  Because USPS adequately accommodated Ms. Clayborne, the Court will grant USPS's motion for summary judgment.

## IV.  CONCLUSION

For the reasons stated above, USPS's motion to dismiss or for summary judgment [Dkt. #11] is GRANTED, and this case is dismissed.  This Memorandum Opinion is accompanied by a memorializing order.

_____/s/_____
ROSEMARY M. COLLYER
DATE: September 11, 2006                    United States District Judge